## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| NICHOLAS CONLAN,<br><br>                    Plaintiff,<br><br>vs.<br><br>COSTCO WHOLESALE<br>CORPORATION,<br><br>                    Defendant. | CV 18-94-H-JTJ<br><br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW<br>AND ORDER** |

## **INTRODUCTION**

The Court conducted a bench trial in this matter beginning on December 9, 2020.  Plaintiff Nicholas Conlan (Conlan) was represented by Kevin E. Vanio, Esq.  Defendant Costco Wholesale Corporation (Costco) was represented by John G. Crist, Esq. and Haley Ford, Esq.  Oral testimony and documentary evidence was presented during the trial.  The parties submitted post-trial briefs and proposed Findings of Fact and Conclusions of Law.  This matter was fully briefed on June 1, 2021.  Based on the record developed in open court, the Court makes the following:

## **FINDINGS OF FACT**

1.      Costco operates cash and carry membership locations, commonly

referred to as "warehouses."  Costco sells merchandise to persons and businesses

who are Costco "members."  Costco owns and operates a warehouse in Helena,

Montana.

2.     Conlan began working at Costco's warehouse in Helena on or about

November 24, 2014.  Conlan was hired as a part-time, seasonal Front-End Service

Assistant.

3.     Conlan had worked for Sam's Club (Costco's rival) prior to his

employment with Costco.  Conlan had success working at Sam's Club.  Conlan

knew, however, that he could not be promoted to a manager's position at Sam's

Club because he had family members who worked there.  Thus, Conlan was

motivated to find work outside of Sam's Club.

4.     Costco gave Conlan his first performance evaluation on

December 22, 2014.  Conlan received high marks for his appearance, his

personality, his sales abilities, and his relations with the public.

5.     Costco offered Conlan the position of Membership Marketer Service

Clerk on or about August 19, 2015.  Conlan worked as a Membership Marketer

Service Clerk from August 19, 2015 through August 21, 2017.  Conlan performed

various marketing activities.  Conlan traveled to marketing events in and around

Helena selling new Costco memberships.

6.      Conlan was successful as Membership Marketer Service

Clerk. Conlan received a positive performance evaluation on November 22, 2016.

Conlan became the top seller of new Costco memberships in March 2017.

7.      Conlan participated in Costco's Employee Club (the Club).

Conlan became the Treasurer of the Club in the fall of 2016. Conlan performed

his duties as Treasurer well.

8.      When Conlan would travel to marketing events outside of Helena he

would sometimes travel on roads covered with snow and ice. Travel on slippery

roads caused Conlan to experience travel anxiety. Conlan's travel anxiety arose

from a car accident that he had experienced on an icy roadway while in high

school. Conlan would sometimes experience migraine headaches as a result of his

travel anxiety. Costco allowed Conlan to take time off work when he experienced

a migraine headache.

9.      Conlan received a 5-week old Yorkshire Terrier dog as a wedding gift

on or about August 30, 2015. Conlan named the dog "Teddy."

10.     Conlan began training Teddy to become a service dog after he had

suffered an anxiety attack on February 14, 2017. Conlan learned how to train

Teddy by reviewing information on the internet. Conlan trained Teddy to alert

him and others if he was about to experience an anxiety attack. Teddy would sit

near Conlan's feet if he sensed that Conlan was becoming anxious.  If Conlan felt an anxiety attack coming on, Conlan would press a button on his watch that would create a noise.  Teddy would respond to the noise by emitting a high-pitched bark that would alert people in the vicinity that Conlan needed medical assistance.

11.     Conlan entered Costco's Helena warehouse as a customer on March 11, 2017, for the purpose of purchasing a set of tires for his vehicle. Conlan had Teddy with him.  Conlan was greeted by his direct supervisor, Warren Miller (Miller).  Miller asked Conlan whether Teddy was a service animal.  Miller also asked Conlan whether Teddy could perform any tasks as a service animal. Conlan responded that Teddy was a service dog and that Teddy had been trained to alert others when he was about to have an anxiety attack.  Miller made no further inquiry.

Conlan then proceeded to the tire shop customer counter where he was greeted by tire shop supervisor, Thomas Wilhelm (Wilhelm).  Conlan purchased a set a tires for his vehicle and took a seat in the tire shop's waiting room while the tires were being installed.

12.     At some point, Conlan left the waiting room and began walking to the restroom located in the tire shop area.  The tire shop manager, Dave Vanderpflug (Vanderpflug) approached Conlan.  Vanderpflug asked Conlan whether Teddy

was a service animal.  Conlan responded that Teddy was a comfort dog.

Vanderpflug told Conlan that he didn't understand why Conlan needed a comfort

dog in the tire shop when he didn't need a dog at work.  Vanderpflug urged

Conlan to take Teddy for a walk outside the warehouse while his new tires were

being installed.

Vanderpflug's comment about Teddy upset Conlan.  Conlan used the

bathroom and returned to the tire shop's waiting room.  Conlan remained in the

waiting room until his new tires were installed.  Conlan then drove home.

13.    Conlan began taking Teddy with him on Costco marketing trips

beginning on or about March 13, 2017.

14.    On March 24, 2017, Conlan met with Allen Arnold (Arnold), the

General Manager of the Helena warehouse.  Conlan told Arnold about the

comments Vanderpflug had made to him in the tire shop on March 11, 2017,

regarding Teddy.  Conlan told Arnold that he believed Vanderplug's comments

were inappropriate.  Arnold told Conlan that he would investigate incident.

During this meeting, Conlan also told Arnold that he would like to bring

Teddy to work.  Conlan presented Arnold with a note that had been written by

Nurse Practitioner Melissa Zimmerman (Zimmerman).  The note, dated

February 10, 2017, stated that Conlan "would benefit from a companion dog

because of mental health reasons." (Ex. 501). Zimmerman prepared the note at Conlan request. Conlan told Zimmerman what to say in the note. Zimmerman had not diagnosed Conlan with a mental illness when she wrote the note.

15.    Conlan met with Arnold again on April 4, 2017. Conlan asked Arnold again whether he could bring Teddy to work. Arnold stated that he would discuss the issue further with Conlan in the near future. Arnold requested that Conlan provide additional information regarding his need to have Teddy at work. Conlan stated that he would obtain a note from his health care provider.

16.    Conlan met with Zimmerman on April 5, 2017. Conlan asked Zimmerman to prepare a second note regarding Teddy. Zimmerman prepared the note. The second note, dated April 5, 2017, stated that Conlan "would benefit from a psychiatric service animal (Teddy) due to his mental health disorder." (Ex. 503). Conlan told Zimmerman what to say in the note. Zimmerman had not diagnosed Conlan with a mental health disorder when she prepared the note.

17.    The first note that Zimmerman prepared described Teddy as a companion dog. The second note that Zimmerman prepared described Teddy as a service dog. A service dog and a companion dog differ in an significant way. A service dog is an animal trained to perform a specific task or service to assist its

-6-

handler with a disability.  A companion dog, on the other hand, is not trained to

perform a specific task or service.  A companion dog provides emotional support

only.

18.    Daniel Manibusan (Manibusan) was an Assistant Warehouse

Manager at Costco's Helena warehouse in 2017.  Conlan met with Manibusan

(Manibusan) on April 12, 2017, regarding Teddy.  Conlan told Manibusan that he

wanted to bring Teddy to work as a service dog.  Conlan also told Manibusan that

he was frustrated with Arnold because Arnold had failed to respond to his request

to bring Teddy to work.  Manibusan told Conlan that Arnold was away on work

and would be returning to the Helena warehouse on April 13, 2017.

19.    Conlan showed Manibusan a card stating that Teddy was a registered

service dog.  Conlan had obtained the registration card from a website on the

Internet.  Conlan explained that he had trained Teddy to alert others when if he

was about to have an anxiety attack.  Conlan also showed Manibusan the note that

Zimmerman had drafted on February 10, 2017, stating that Conlan would benefit

from a companion dog.  Conlan told Manibusan that Teddy had been traveling

with him to Costco marketing events.

20.    When Arnold returned to the Helena warehouse, Manibusan told

Arnold about his conversation with Conlan.

21.    Conlan brought Teddy to work on April 13, 2017. Arnold asked Conlan to step into his office. Assistant Warehouse Manager Dave Preston (Preston) was already in Arnold's office. Conlan told Arnold and Preston that he wanted Teddy to accompany him at work as a service dog. Conlan explained that he needed Teddy with him at work due to his issues with anxiety.

Arnold called Margo Fincher (Fincher) by telephone so she could participate in the conference regarding Teddy. Fincher was an Integrated Leave and Accommodation Specialist in Costco's corporate office in Issaquah, Washington.

22.    Conlan, Arnold and Fincher discussed Conlan's request to bring Teddy to work. Conlan explained that Teddy would alert him and others when he was about to have an anxiety attack. Fincher reviewed a copy of the note that Zimmerman had prepared on February 10, 2017, stating that Conlan would benefit from a companion dog.

23.    Fincher told Conlan that Costco could not make a decision regarding Teddy at that time because Costco needed some additional information from his health care provider. Costco explained that it needed to know Conlan's functional limitations and work restrictions. Conlan replied that he had additional information at home. Fincher asked Conlan to retrieve the documents and bring

-8-

them to the warehouse.  Conlan stated that he was unable to do that.  Fincher

asked Conlan to take a picture of the documents with his cell phone and send the

documents to her electronically.  Conlan stated that he could not do that because

Costco prohibited him from using his personal cell phone for work related matters.

Fincher asked Conlan if there was anything that Costco could do that would

allow him to work the rest of the day without Teddy.  Conlan responded that there

was not.  Fincher then told Conlan that he would be placed on administrative leave

with pay.

24.   Later the same day, Arnold sent Conlan a letter that had been drafted

by Fincher.  (Ex. 502).  The letter summarized generally the matters that had been

discussed during the April 13, 2017, telephone conference.  *Id.*

25.   Conlan responded to Costco's request for additional medical

information on April 18, 2017.  Conlan provided Costco with the note that

Zimmerman had drafted on April 5, 2017, which stated that Conlan "would benefit

from a psychiatric service animal (Teddy) due to his mental health disorder."

(Ex. 503).

26.   Fincher reviewed Zimmerman's April 5, 2017 note.  Fincher

concluded that Costco could not make a decision on whether Conlan needed

Teddy as a service dog, based on Zimmerman's note.  Fincher concluded that

-9-

Zimmerman's note was deficient for the following reasons: (1) it did not describe Conlan's work restrictions, if any; (2) it provided no information as to the duration of Conlan's work restrictions; and (3) it did not describe the services that Teddy was trained to provide.

27.     Fincher sent Conlan a letter on April 19, 2017.  (Ex. 504).  Fincher's April 19, 2017, letter described in detail the information that Costco needed to properly evaluate Conlan's request for an accommodation.  Fincher asked Conlan to provide the following information:

      a.     a description of the functional limitations that affected his ability to work;

      b.     a description of his work restrictions;

      c.     a list of the accommodations other than a service dog that would ameliorate his work restrictions;

      d.     the tasks that his service dog was trained to perform;

      e.     a description of how close his service dog needed to be to Conlan to do its job; and

      f.     whether Conlan could work safely without the use of a service dog.

(Ex. 504 at 2-3).

28.     Enclosed with the letter was a Job Analysis Summary and

-10-

a Work Restrictions Form.  (Exs. 505, 506).  The Job Analysis Summary described

Conlan's job duties.  The Work Restrictions Form was designed to assist Conlan's

health care provider in describing any work restrictions that Conlan had.

29.    Also enclosed with the letter was a medical Authorization Form that

Conlan could sign if he wished to do so.  (Ex. 12).  The Authorization Form, if

signed by Conlan, would authorize third-party provider, Work Care, to make

direct contact with Conlan's health care provider (at Costco's expense) to assist

Conlan in obtaining the documentation and information Costco needed to fully

understand the nature and extent of Conlan's work restrictions.  *Id.*

30.    Conlan gave the letter, Job Analysis Summary, and Work Restriction

Form to Zimmerman on April 25, 2017.  Zimmerman signed the letter indicating

that she had received it.  (Ex. 507).

31.    Zimmerman checked a box on the Job Analysis Summary stating that

Conlan was "Approved to return to his position without restrictions."  (Ex. 505 at

4).

32.    Zimmerman also completed the Work Restriction Form.  On the top

of the first page of the Work Restriction Form, there was a question that asked

whether Conlan was "released to work?"  Zimmerman checked the  "yes" box.

(Ex. 506).

-11-

33.     There were multiple areas on the Work Restriction Form for Zimmerman to describe Conlan's work restrictions.  Zimmerman checked the boxes indicating that Conlan had no work restrictions.  Specifically, Zimmerman indicated that Conlan had no restrictions with respect to:  "Body Position," "Strength," "Other Physical Demands," "Environmental Conditions," "Vision/Auditory or Noise," and "Mental and Psychological Demands."  (Ex. 506 at 1-3).

34.     There was also an area on the Work Restriction Form that sought "Additional Comments."  In this area of the form, Zimmerman wrote: "No restrictions.  Work accommodation of service animal requested."  (Ex. 506 at 3).

35.     Zimmerman also prepared a related note.  (Ex. 508).  The note, dated April 26, 2017, stated in pertinent part as follows:

> "Work restrictions for Nicholas' mental health are not limited, however, he benefits from a companion/psychiatric animal.  This animal helps decrease anxiety and helps manage panic attacks when they arise, and should be available for full contact at all times as a service animal.  Nicholas has not had a seizure for four years, and this animal is not for that purpose.  This service animal is a benefit to Nicholas' mental health disorder, anxiety management, and for coping with panic attacks."
>
> Please call if you have any questions.

(Ex. 508).

36.     Conlan sent Costco a certified letter on May 1, 2017.  (Ex. 509).  The

letter included the Job Analysis Summary and Work Restriction Form that

Zimmerman had filled-out, and Zimmerman's April 26, 2017, note.

37.    Conlan informed Costco, in his letter, that he had not signed the

medical Authorization Form that would have allowed Work Care to contact

Zimmerman.  (Ex. 509).  Conlan explained that Costco should contact him directly

if Costco needed any additional medical information regarding his request for an

accommodation.  *Id.*

38.    Costco reviewed the documents that Conlan had provided.  Costco

concluded reasonably, based on the statements that Zimmerman made on the Job

Analysis Summary and Work Restriction Form, and in her April 26, 2017 note,

that Conlan had no restrictions that precluded him from performing the essential

functions of his job, but Conlan was nevertheless requesting to bring Teddy to

work as a service dog.

39.    Costco sent Conlan a letter on May 10, 2017, signed by Arnold.

(Ex. 510).  Costco informed Conlan that his request to bring his dog to work was

not approved given that Zimmerman had stated that he had no work restrictions.

*Id.*  Costco told Conlan that he should return to work on May 16, 2017.  *Id.*

40.    Conlan called Arnold on May 17, 2017, the day after he was

scheduled to return to work.  Conlan told Arnold that he would not return to work

without Teddy.  Arnold responded that Conlan should return to work because

Zimmerman had authorized him to return to work without restrictions.

Arnold and Conlan then discussed whether Conlan qualified for a leave of

absence.  Costco employees with medical conditions may apply for a leave of

absence.  (*See* Ex. 516 at p. 4).

41.    Conlan sent Costco a letter on June 2, 2017.  (Ex. 24).  Enclosed with

the letter was a note that Zimmerman had drafted on May 11, 2017, at Conlan's

request.  (*See* Ex. 511).  The note stated that "Teddy, Nicholas' Psychiatric Service

Animal, provides anxialysis and should be available to [Conlan] for full contact at

all times as a work accommodation."  *Id.*

42.    Although Zimmerman had referred to Teddy as a "service

animal" in her notes dated April 5, 2017, April 26, 2017, and May 11, 2017, and in

the Work Restrict Form that she had filled-out on April 26, 2017 (Exs. 503, 506,

508 and 511), Zimmerman testified at trial that she had erred when she described

Teddy as a service animal.  Zimmerman testified that she should have described

Teddy as an emotional support animal.  (Doc. 118 at 194, 196, 201-202, 205, 209-

210).  Zimmerman testified that she did not possess the professional certification

required to classify a dog as a "service animal."  (Doc. 118 at 215).

43.     Costco responded to Conlan's June 2, 2017, letter with a letter dated
June 7, 2017. (Ex. 513). The letter was drafted by Costco's corporate Human
Resources Department and signed by Arnold. Costco explained that Zimmerman's
May 11, 2017, note did not override Zimmerman's prior certification on April 25,
2017, that Conlan was able to return to work without restrictions. (Ex. 513 at 1).

Enclosed with the letter was a Health Care Provider Form. Costco
explained that the Health Care Provider Form was to be filled out by Conlan's
health care provider if Conlan wished to apply for a medical leave of absence for
the work days that he had missed since May 16, 2017. Costco informed Conlan
that the deadline for submitting the completed Health Care Provider Form was
June 24, 2017. (Ex. 513 at 1).

44.     Costco sent Conlan another letter on July 14, 2017. (Ex. 29).
The purpose of the letter was to remind Conlan that he needed to complete the
previously provided Health Care Provider Form if he wanted to request a leave of
absence for the work days that he had missed since May 16, 2017. *Id.* Costco
told Conlan that he had until July 28, 2017, to submit the completed Health Care
Provider Form. Costco further informed Conlan that if he failed to submit the
completed Health Care Provider Form to Costco by that date, Costco may

-15-

terminate his employment for failing to comply with Costco's leave of absence policy. *Id.*

45.    Costco sent Conlan another letter on July 17, 2017. (Ex. 514). Costco informed Conlan that Costco had extended the deadline for his submission of the completed Health Care Provider Form. Costco informed Conlan that the new deadline was August 1, 2017. *Id.*

46.    Conlan contacted Manibusan by telephone on July 19, 2017. Conlan told Manibusan that Zimmerman had refused to complete the Health Care Provider Form. Conlan stated that Zimmerman had refused to complete the Health Care Provider Form because she believed that Conlan was able to return to work. Conlan never provided Costco with the completed Health Care Provider Form.

47.    Conlan's last day of work was April 13, 2017. Conlan's leave of absence after May 17, 2017, was unauthorized.

48.    Costco's Employee Agreement (the employee handbook) provides that a violation of Costco's Leave of Absence Policy provides grounds for the termination. (Ex. 516 at 12). Conlan had received a copy of the employee handbook on or about March 18, 2016. (Ex. 517).

49.    Costco sent a letter to Conlan on August 21, 2017, informing Conlan

that his employment at Costco had been terminated. (Ex. 515). Costco informed

Conlan that his employment had been terminated because he had violated Costco's

leave of absence policy. *Id.*

50. Conlan never informed Costco, at any time prior to his termination,

that his travel anxiety restricted or limited his ability to drive on snowy or icy

roads. The first time that Conlan informed Costco that his travel anxiety restricted

or limited his ability to drive on snowy or icy roads was when he testified at trial.

51. Conlan had a Costco customer membership in 2017. Conlan's

customer  membership entitled him to purchase merchandise in Costco's

warehouses.

52. It was Costco's policy to abide by all laws, rules and regulations

when a Costco member entered a Costco warehouse with a service animal.

53. Costco's employees have access to policies and educational materials

that address the use of service animals by members. (*See* Exs. 520, 521).

54. The educational materials address the public accommodation

provisions of the Americans with Disabilities Act with respect to service animals.

The educational materials include lists of frequently asked questions that are

designed to assist employees who may encounter members or other shoppers with

service animals. (Ex. 522).

55.     Costco's Assistant Warehouse Manager Dave Preston had received training with respect to service animals prior to July of 2017.  Preston was knowledgeable about Costco's policies with respect to the use of service animals by customers.

56.     Preston had developed an informal mentor-mentee relationship with Conlan prior to July of 2017.

57.     Conlan had told Preston, prior to July of 2017, that he had experienced travel anxiety and that he had a "comfort dog" to assist him with his anxiety.

58.     Preston, because of his training, understood that there was a difference between a comfort dog and a service dog.  Preston knew that a service dog was an animal that had been specifically trained to perform certain tasks for a person with a disability, while a comfort dog merely provided support and comfort, and did not perform specific tasks for a person with a disability.

59.     Preston was working in the Helena warehouse on July 20, 2017. Preston was approached by a member who told him that another member had a dog in the pharmacy area.  Preston walked to the pharmacy area.  Preston observed Conlan and Teddy.  Preston and Conlan engaged in casual conversation.  Preston then asked Conlan whether Teddy was a comfort dog.

-18-

60.    Conlan replied that Teddy was a service dog.  Preston understood

from his training that, when a member came into the warehouse with a dog, he

could make only a limited inquiry to determine whether the dog was a service

animal.  If the member said that the dog was a service animal, Preston knew that

he could only ask the member to describe the task that the dog was trained to

perform.

61.    Preston asked Conlan to identify the task that Teddy was trained to

perform.  Conlan replied that Teddy was trained to alert others if he was having an

anxiety attack.

62.    Given Conlan's response, Preston did not raise any objections to

Teddy being in the warehouse, and Preston made no further inquiries regarding

Teddy status as a service dog.

63.    The Manager of the Pharmacy, Nikki Demartin (Demartin), observed

Conlan and Preston as they spoke.  Demartin testified that the conversation looked

friendly.  Demarin saw nothing that looked like an argument.  Demartin observed

no body language which made her think that Conlan and Preston were in any sort

of confrontation or argument.

64.    At some point, Conlan told Preston that he needed to use a telephone

to call someone at Costco's corporate office regarding his 401(k) account.  Conlan

told Preston that he was unable to make the call on his cell phone because it was broken.

65.     Preston told Conlan that he could use the telephone in Arnold's private office once he got his prescription filled.  Preston escorted Conlan to Arnold's office.

66.     Preston helped Conlan locate the phone number of Costco's corporate office.  Preston left Conlan and Teddy alone in Arnold's office.

67.     Conlan left the warehouse of his own accord after completing his telephone call.

68.     At no time did Preston tell Conlan that he or Teddy were not welcome in Costco's warehouse.

69.     Conlan filed an administrative complaint with the Montana Human Rights Bureau and the Equal Employment Opportunity Commission (EEOC) on November 7, 2017.  (Ex. 523).  Conlan alleged that Costco had violated his rights in a place of public accommodation by prohibiting him from having Teddy in the Helena warehouse on July 20, 2017.  *Id.*

70.     The Montana Human Rights Bureau investigated Conlan's Claim. The Montana Human Rights Bureau issued its Final Investigative Report on May 7, 2018.  (Ex. 524).  The Final Investigative Report addressed the encounter

between Preston and Conlan on July 20, 2017.  The Montana Human Rights

Bureau dismissed Conlan's administrative complaint on May 7, 2018.  (Ex. 525).

71.     Conlan initiated the present action on March 5, 2018, in the Montana

Fifth Judicial District Court, Jefferson County.  (Doc. 6).

72.     Conlan amended his Complaint on August 6, 2018.  (Doc. 1-1 at 2).

Conlan served the Amended Complaint on Costco on September 22, 2018.  (*See*

Doc. 1 at 2).

73.     Costco removed the case on September 25, 2018, invoking this

Court's diversity jurisdiction.  (Doc. 1).

## CONCLUSIONS OF LAW

1.     This Court possesses jurisdiction over the parties and the subject

matter of this action under 28 U.S.C. § 1332.  Venue is proper given that Conlan

was employed by Costco in Helena, Montana.

2.     Conlan has asserted discrimination claims against Costco based

on his status as a Costco employee and based on his status as a Costco member-

customer.

3.     Conlan's discrimination claims are grounded on the Americans

with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* and on the Montana

Human Rights Act (MHRA), Mont. Code Ann. §§ 49-2-101 *et seq.*  (Doc. 32).

Conlan alleges in Count 1 of his Second Amended Complaint that Costco violated the MHRA by failing to accommodate his mental disability.  Conlan alleges in Count 2 that Costco violated the public accommodation provisions of the MHRA by refusing to allow Teddy to accompany him in the Helena warehouse when he was shopping as a customer on July 20, 2017.  Conlan alleges in Count 3 that Costco violated the MHRA by retaliating against him for requesting an accommodation, and for filing an administrative claim of discrimination with the Montana Human Rights Bureau.  Conlan alleges in Counts 4 and 5 that Costco violated the MHRA and the ADA by terminating his employment because of his mental disability.

## A.    **Disability Discrimination Claims — (Counts 4 and 5)**

4.    The ADA makes it unlawful for an employer to discriminate against an employee on the basis of his disability.  42 U.S.C. § 12112(a).

5.    The MHRA is modeled after the ADA.  *Pannoni v. Board of Trustees*, 90 P.3d 438, 444 (Mont. 2004).  Montana follows federal law in interpreting the MHRA.  *Id.*; *Borges v. Missoula County Sheriff's Office*, 415 P.3d 976, 984 (Mont. 2018).

6.    The Court analyzes a disability discrimination claim under the

burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). See *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Under the *McDonnell* framework, the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff succeeds in doing so, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802-803. Finally, if the defendant carries its burden, the plaintiff must then prove that the reason offered by the defendant was not its true reason, but rather a pretext for discrimination. *Id.* at 804-805.

7.   To establish a *prima facie* case of disability discrimination under either the ADA or the MHRA, a plaintiff must prove:

(1)   That he is disabled person;

(2)   That he is qualified to perform the essential functions of his job; and

(3)   That he suffered an adverse employment action because of his mental or physical disability.

*Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996); *Pannoni*, 90 P.3d at 444.

## Element No. 1 — The Plaintiff Must Possess a Disability

8.      An individual is considered "disabled under the ADA and the MHRA

if he (1) has a mental or physical impairment that substantially limits one or more

major life activities; (2) has a record of a disability; or (3) is regarded by his

employer as having a disability.  Conlan's discrimination claim is based on an

actual disability.  42 U.S.C. § 12102(1); Mont. Code Ann. § 49-2-101(19)(a).

9.      When a plaintiff alleges a discrimination based on an actual

disability, the plaintiff must show: (1) that he possesses a physical or mental

impairment; and (2) that the impairment imposes a substantial limitation on one or

more major life activities.  42 U.S.C. § 12102(1)(A); Mont. Code Ann. § 49-2-

101(19)(a)(i).

10.     The term mental impairment is defined by the federal regulations as

"[a]ny mental or psychological disorder, such as . . . an emotional or mental

illness.  29 C.F.R. § 1630.2(h).

11.     Expert medical testimony may be used to establish that a plaintiff has

a physical or mental impairment. *Tesone v. Empire Marketing Strategies*, 942

F.3d 979, 996 (10th Cir. 2019).   However, neither the ADA or its implementing

regulations state that medical testimony is required.  *Id.*  There is no general rule

that medical testimony is always necessary to establish an impairment.  *Id.*

-24-

Whether medical evidence is necessary to establish the existence of an impairment is a determination that must be made on a case-by-case basis. *Id.*; *Mancini v. City of Providence*, 909 F.3d 32, 39 (1st Cir. 2018).

12.     Courts generally require medical evidence when an impairment "would be unfamiliar to a lay jury and only an expert could diagnose the condition." *Tesone*, 942 F.3d at 996 (quoting *Mancini*, 909 F.3d at 41). By contrast, when a plaintiff alleges an impairment "that a lay jury can fathom without expert guidance," courts generally "do not require medical evidence" to establish the impairment. *Tesone*, 942 F.3d at 996 (quoting *Mancini*, 909 F.3d at 42).

13.     Here, Conlan testified that he suffers from travel anxiety and anxiety related panic attacks. Conlan testified that his travel anxiety stems from a car accident he experienced on an icy roadway when he was 16 years old. Conlan testified that he continues to suffer anxiety and anxiety related panic attacks when he travels on icy roadways. Conlan's testimony was supported by medical evidence. Zimmerman testified that when she first met Conlan in 2016 or 2017, Conlan told her that he had previously been diagnosed with anxiety by a medical provider. Conlan also told Zimmerman that the medical provider had prescribed Benzodiazepine to address his anxiety symptoms. Zimmerman testified that

Conlan had appeared anxious on more than one occasion.  Zimmerman testified

that she treated Conlan by continuing his anxiety medication and by referring

Conlan to a psychologist and a social worker.  Anxiety disorders may qualify as a

mental impairment.  See, e.g. *Jones v. McDonough*, 2021 WL 964045, at *11

(M.D. Tenn. March 15, 2021); *Asorga v. Idahoan Foods, LLC*, 2019 WL 4120803,

at *5 (D. Idaho Aug. 29, 2019).  The Court finds that Conlan presented sufficient

evidence to prove that he had a mental impairment for purposes of the ADA and

the MHRA.

14.    An impairment qualifies as a disability if the impairment

"substantially limits" one or more a major life activities.  42 U.S.C. § 12102(1)(A).

The term "substantially limits" means that the impairment substantially limits the

ability of an individual to perform a major life activity as "compared to most

people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).

15.    The determination of whether an impairment "substantially limits" a

major life activity requires an individualized assessment.  29 C.F.R.

§ 1630.2(j)(1)(iv).

16.    Episodic impairments qualify as a disability if the episodic

impairment "would substantially limit a major life activity when active."

42 U.S.C. § 12102(4)(D).

17.     When a court assesses whether an impairment substantially limits a major life activity it must not consider the ameliorative effects of mitigating measures, such as medication.  29 C.F.R. § 1630.2(j)(1)(vi).

18.     Expert medical testimony may be used to establish that an impairment substantially limits a major life activity. *Tesone*, 942 F.3d at 996.  However, neither the ADA or its implementing regulations require that a plaintiff present medical testimony. *Id.*  To the contrary, the implementing regulations state that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v).

19.     "Major life activities" are normal activities of living which a non-disabled person can do with little or no difficulty.  The ADA sets forth a non-exclusive list of major life activities.  Major life activities include, but are not limited to, "carrying for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

20.     Here, Conlan testified that his travel anxiety and anxiety related

panic attacks, when active, substantially limited his memory, his ability to

articulate, and his ability to drive a car on slippery roadways.  Conlan testified that

when he has a panic attack his face goes numb, his fingers lock up, he

hyperventilates, and he communicate in mumbles.  Costco did not refute Conlan's

testimony regarding the limiting effects of his travel anxiety and panic attacks.

The Court finds that Conlan presented sufficient evidence to prove that his anxiety

and panic attacks substantially limited more than one major life activity.  Conlan

proved that he had a mental disability for purposes of the MHRA.

### Element 2 — The Plaintiff Must be a Qualified Individual

21.    To state a claim of discrimination under either the ADA or the

MHRA, a plaintiff must show that he is a "qualified individual."  *See* 42 U.S.C.

§ 12112(a).  The ADA defines a "qualified individual" as an individual with a

disability who, can perform "the essential functions of the employment position

that such individual holds or desires," with or without a reasonable

accommodation.  42 U.S.C. § 12111(8).   The term "essential functions" means the

"fundamental job duties of the employment position the individual with a

disability holds or desires."  29 C.F. R. § 1630.2(n)(1).

22.    Here, it is clear that Conlan could perform the fundamental job

duties of a Membership Marketer Service Clerk.  Conlan received a positive

performance evaluation on November 22, 2016.  Conlan became the top seller of

new Costco memberships in March 2017.  The Court finds that Conlan presented

sufficient evidence to prove that he was a "qualified individual" for purposes of

the ADA and the MHRA.

### Element 3 — Adverse Employment Action Based on a Disability

23.     To establish a *prima facie* case of disability discrimination, Conlan

must show that Costco terminated his employment because of his travel anxiety.

24.     The evidence as to Costco's actions is not in dispute.  When Costco

could not immediately address Conlan's request for an accommodation on

April 13, 2017, Costco placed Conlan on a leave of absence.  When Zimmerman

cleared Conlan to return to work without restrictions on or about May 1, 2017,

Costco informed Conlan that his request for an accommodation was not approved

and that he should return to work on May 16, 2017.   Conlan did not return to

work on  May 16, 2017, as scheduled.  Instead, Conlan contacted Costco the

following day, and said he would not return to work without his dog.  At that

point, Conlan was on an unauthorized leave of absence.

25.     Costco has a medical leave program available to qualifying

employees.  Costco informed Conlan of that option and provided Conlan with the necessary paperwork to request a medical leave of absence.  Conlan never sought a leave of absence.

26.     Costco informed Conlan in writing on June 7, 2017, that he was on an unauthorized leave of absence as of May 16, 2017, and that company policy provided that an unauthorized leave of absence was cause for termination. (Ex. 513).

27.     Costco warned Conlan in writing on July 17, 2017, that his employment may be terminated given that his leave of absence had not been authorized.  (Ex. 514).  Conlan did not respond to Costco's letter.

28.     Costco terminated Conlan's employment on August 21, 2017, because Conlan had violated Costco's leave of absence policy by remaining on unauthorized leave for approximately 90 days.  (Exs. 515, 518).

29.     An employer may lawfully terminate an employee when the employee has no work restrictions and fails to return to work in violation of an employer's leave of absence policy.  See *Garcia v. Salvation Army*, 918 F.3d 997, 1009-1010 (9th Cir. 2019).

30.     Costco's lawfully terminated Conlan's employment.

31.    Conlan failed to prove that Costco terminated his employment because of his mental disability.  Conlan presented no evidence tying his termination to his mental disability.  Conlan has failed to establish a *prima facie* case of disability discrimination.  Costco is not liable to Conlan under either Count 4 or Count 5.

## B.    Failure to Accommodate Claim — (Count 1)

32.    A failure to accommodate claim "refers to the employer's failure to take action that would permit an otherwise qualified employee to perform his essential job functions." *Alexander v. Montana Development Center*, 430 P.3d 90, 95 (Mont. 2018).  When an employee has a disability that restricts his ability to perform an essential function of his job, the employer must provide the employee a reasonable accommodation, absent a showing that the accommodation would impose an undue hardship.  42 U.S.C. § 12112(b)(5)(A); Mont. Code Ann. § 49-2-101(19)(b); *Garcia*, 918 F.3d at 1010; *Alexander*, 430 P.3d at 95.  However, if the employee's disability does not restrict the employee's ability to perform an essential function of his job, the employer is not required to provide a reasonable accommodation under either the ADA or the MHRA because there is no restriction to accommodate.  *Garcia*, 918 F.3d at 1010; *Alexander*, 430 P.3d at 95.

33.    Conlan's medical provider, Zimmerman, stated multiple times in writing that Conlan had no work restrictions and that Conlan could return to work without restrictions.  (See Exhibits 505, 506 and 508).  Conlan offered no testimony to the contrary at trial.  Conlan himself, admitted on direct examination that he had no work restrictions in April 2017, when he and Zimmerman reviewed Fincher's April 19, 2017, letter and filled-out the Work Restriction Form and Job Analysis Summary that were enclosed with Fincher's letter.  (Doc. 119 at 183).

34.    The fact that Zimmerman had cleared Conlan to return to work without restrictions meant that Costco had no obligation to accommodate Conlan's mental disability.  *Garcia*, 918 F.3d at 1010; *Alwood v. Ecolab, Inc.*, 2017 WL 1162164, at *20 (D. Mont. Mar. 28, 2017); see also, *Ballard v. Terros Inc.*, 2021 WL 1597892, at *6 (D. Ariz. Apr. 23, 2021)(a doctor's release to work without restrictions supports a finding that a person no longer suffers from a disability requiring an accommodation); *Rivera v. FedEx Corp.*, 2013 WL 6672401, at *4-5 (N.D. Cal. Dec. 18, 2013)(plaintiff failed to demonstrate disability requiring accommodation upon doctor's clearance without restrictions).

35.    Given that Conlan had failed to prove that he had any restrictions which precluded him from performing the essential function of his job, Costco did

not discriminate against Conlan in violation of the ADA or the MHRA when it declined to give Conlan the accommodation of a dog at work.

36.   Conlan failed to prove his Failure to Accommodate Claim.  Costco is not liable to Conlan under Count 1.

### The Interactive Process

37.   An interactive process violation refers to a failure by an employer to communicate with an employee about potential accommodations.  *Alexander*, 430 P. 3d at 95.  When an employee notifies his employer that he has a need for an accommodation, that notification triggers an obligation on the employer and the employee to engage in an "interactive process."  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111-1116 (9th Cir. 2000); *Borges*, 415 P.3d at 984.

38.   The shared goal is to identify the restrictions caused by the employee's disability, and identify a reasonable accommodation that would allow the employee to perform his job effectively despite his disability.  *Barnett*, 228 F.3d at 1114-1115; *Borges*, 415 P.3d at 984.  Both the employer and the employee must communicate in good faith during the interactive process.  *Id.*  The employer and employee must communicate directly and exchange essential information.  *Id.* Neither side can delay or obstruct the process.  *Id.*

39.     If an employer fails to engage in the interactive process in good faith, the employer will face liability, if a reasonable accommodation would have been possible. *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (quoting *Barnett*, 228 F.3d at 1116).

40.     If the employee causes a breakdown in the interactive process, the employer faces no liability under either ADA or the MHRA. *Romero v. County of Santa-Clara*, 666 Fed. Appx. 609, 611 (9th Cir. 2016); *Alexander*, 430 P.3d at 280.

41.     Costco has an entire Integrated Leave Department designed to handle employee disability claims and requests for accommodations. When Conlan first stated that he wanted a dog as an accommodation, the managers at Costco's Helena warehouse asked Costco's Integrated Leave and Accommodation Specialist Margo Fincher to engage Conlan in the interactive process.

42.     Fincher gathered information from Conlan over the phone. Fincher reviewed the notes that Zimmerman had prepared on February 10, 2017, and on April 5, 2017.

43.      Because Zimmerman's notes failed to contain the information that Costco needed to properly evaluate Conlan's accommodation request,

Fincher sent Conlan a very detailed letter which included a Job Analysis

Form so Zimmerman could understand the essential functions of Conlan's

job, and a Work Restriction Form so Zimmerman could identify Conlan's

work restrictions with precision.

44.    Fincher's letter also informed Conlan that he could use

WorkCare, at Costco's expense, to assist him in producing the requested

information regarding his work restrictions.  While Conlan did not use

WorkCare, which was his choice, Costco demonstrated its commitment to

the interactive process by making this option available to Conlan.  (Exs.

504, 505 and 506).

45.    Zimmerman stated on the Work Restriction Form that Conlan

had no work restrictions and that Conlan could return to work without any

restrictions, but that Conlan nevertheless was requesting to bring his dog to

work as an accommodation.  (Exs. 505 and 506).  Costco's obligation to

continue the interactive process ceased at that point because Zimmerman

had stated clearly that Conlan's travel anxiety did not restrict his ability to

perform any of the essential functions of his job.  *Alwood*, 2017 WL

1162164, at *20; *Garcia*, 918 F.3d at 1010.

46.    Costco understood that Conlan wanted to have his dog with

him at work even though he had no work restrictions. Zimmerman made that clear on the Work Restriction Form (Ex. 506), and in her May 11, 2017, letter. (Ex. 511). However, Costco did not violate the ADA or the MHRA by declining Conlan's request given that Zimmerman had stated that Conlan had no work restrictions. *Alwood*, 2017 WL 1162164, at *20; *Garcia*, 918 F.3d at 1010.

47.    Costco was not required to restart the interactive process in the absence of additional evidence that would serve to modify Zimmerman's statements that Conlan had no work restrictions. See *Garcia*, 918 F.3d at 1010; *Allen v. Pacific Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003). Conlan presented no such evidence to Costco prior to the date his employment was terminated. The first time that Conlan told Costco that his travel anxiety restricted his ability to travel on icy roads was at trial.

48.    Costco participated in the interactive process in good faith. No violation of the ADA or the MHRA occurred.

## C.    <u>The Retaliation Claim — (Count 3)</u>

49.    To establish a *prima facie* case of retaliation under the MHRA, a plaintiff must prove:

> (1)   That he engaged in a protected activity;

(2) That his employer took an adverse action against him; and

(3) That a causal link existed between the protected activity and the employer's action.

*Rolison v. Bozeman Deaconess Health Services, Inc.*, 111 P.3d 202, 217 (Mont. 2005); *Alwood*, 2016 WL 1451529, at *6.

50.   To establish causation between a protected act and an adverse employment action, the employee demonstrate that engaging in the protected activity was one of the reasons for the adverse employment action and but for the protected activity the adverse employment action would not have occurred. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-1065 (9th Cir. 2002).

51.   Here, Conlan established the first two elements of his *prima facie* case, but failed to establish the third element.  Conlan established that he had engaged in a protected activity.  Conlan testified that he requested a reasonable accommodation and that he filed a discrimination complaint with the Montana Human Rights Bureau.  Conlan also established that Costco undertook an adverse employment action against him by terminating his employment.  However, Conlan failed to establish a causal link between his protected activity and Costco's decision to terminate his employment.

-37-

Conlan presented no evidence that his request for a reasonable accommodation, or his filing of a complaint before the Montana Human Rights Bureau, was one of the reasons for his termination and that but for his protected activity he would not have been terminated. *Villiarimo*, 281 F.3d at 1064-1065.

52.    The evidence showed that Costco terminated Conlan's employment because Conlan had violated Costco's leave of absence policy.

## D.    The Public Accommodation Claim — (Count 2)

53.    Conlan alleges in Count 2 of his Second Amended Complaint that Costco violated the public accommodation provisions of the MHRA by not allowing him to have his dog Teddy in Costco's Helena warehouse on July 20, 2017, when he entered the warehouse as a customer.

54.    The MHRA makes it illegal to discriminate against a disabled person by refusing to allow him access to a place of public accommodation. Mont. Code Ann. § 49-2-304(1)(a).

55.    The MHRA mirrors Title III of the ADA. Title III prohibits discrimination in access to public accommodations by providing that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

-38-

advantages, or accommodations of any place of public accommodation."

42 U.S.C. § 12182(a).

56.    Costco's Helena warehouse qualifies as a place of public

accommodation under Montana law given that it offers goods and services

to members of the public.  Mont. Code Ann. § 49-2-101(20)(a).

57.    Persons with disabilities are allowed to be accompanied by

service animal in places of public accommodation.  Mont. Code Ann. § 49-

4-214(1).

58.    A service animal means a dog "that is individually trained to

provide assistance to an individual with a disability."  Mont. Code Ann.

§ 49-4-203(2).

59.    It was unclear, from the evidence presented, whether Teddy

was a service dog protected by Montana law, or merely a comfort dog.

Conlan asked Zimmerman to refer to Teddy a companion dog, not a service

dog, in the first letter Zimmerman wrote for Conlan on February 10, 2017.

Zimmerman testified that she had erred when she later referred to Teddy as a

service dog in the notes she prepared on April 5, 2017, and on April 26,

2017.  Zimmerman testified that Teddy was actually an emotional support

dog.  (Doc. 118 at 196).

Conlan, on the other hand, testified that Teddy was a service dog. Conlan testified that when he felt a panic attack coming on he would push a button on his watch which would emit a noise. Teddy would respond to the noise by sitting near his feet and bark. Teddy's bark would alert people in the vicinity that Conlan needed assistance. Conlan testified that he learned how to train Teddy as a service dog by reviewing information on the Internet.

60.     The federal regulations interpreting the ADA state that an employee working in a place of public accommodation may ask a customer two questions if the customer brings an animal into the location. The employee may ask (a) whether the animal is a service animal required because of a disability and (b) what work or task the animal has been trained to perform. 28 C.F.R. § 35.136(f).

61.     When Conlan first entered the Helena warehouse on July 20, 2017, a Costco employee at the door asked Conlan whether Teddy was a service animal. When Conlan responded that Teddy was a service dog trained to assist him in the event of a panic attack, the Costco employee allowed Conlan and Teddy to enter the warehouse. No discrimination occurred.

62.     Costco's Assistant Manager, Dave Preston, later observed
Conlan in the pharmacy area. Preston asked Conlan whether Teddy was a
comfort dog. Preston asked whether Teddy was a comfort dog because
Conlan had previously told Preston that Teddy was a comfort dog. When
Conlan responded that Teddy was a service dog, Preston made no further
inquiry. Preston did not limit Conlan's ability to have his dog in the
warehouse. No discrimination occurred.

63.     When Conlan later told Preston that he needed to use a
telephone in the warehouse because his cell phone was broken, Preston
allowed Conlan to use the telephone in the General Manager's office. It
would make no sense for Preston to escort Conlan and his dog to the
General Manager's office, and then allow Conlan to make a personal phone
call, if, as Conlan claims, Preston told Conlan that neither he nor his dog
were allowed in the warehouse and they needed to leave.

64 .     The evidence presented at trial established that no Costco
employee discriminated against Conlan in violation of Montana law when
Conlan brought Teddy into the Helena warehouse on July 20, 2017. Costco
is not liable to Conlan under Count 2.

## **ORDER**

1.      All of Conlan's claims against Costco are DISMISSED with prejudice.

2.      The Clerk is directed to enter judgment accordingly.

DATED this 9th day of June, 2021.

John Johnston
United States Magistrate Judge